

# NUMBER 13-21-00411-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF O.O. JR., A CHILD

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Memorandum Opinion by Justice Hinojosa

This is an appeal from the termination of parental rights of C.L. (Mother) and O.O. Sr. (Father) to O.O. Jr. (O.O.), their two-year-old son at the time of trial.[1] In his appeal, Father contends: (1) the trial court's judgment is void for lack of subject matter jurisdiction; (2) the evidence is legally and factually insufficient to support the finding that termination

---

[1] To protect the identity of the minor children, we refer to the children and their relatives by their initials or an alias. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(a).

of his parental rights is in O.O.'s best interest; and (3) contingent on the best interest finding, the trial court abused its discretion in its appointment of the Texas Department of Family and Protective Services (the Department) as O.O.'s permanent managing conservator.

Mother, in her appeal, contends there is legally and factually insufficient evidence to support the trial court's findings that: (1) there exists a statutory predicate to terminate her parental rights under §§ 161.001(b)(1)(B), (D), (E), (N), or (O) of the Texas Family Code; and (2) it is in the best interests of O.O. to terminate her parental rights.

On May 5, 2022, we issued a memorandum opinion affirming the trial court's order terminating both Mother and Father's parental rights. On May 13, 2022, Father filed a timely motion for rehearing. We deny the motion for rehearing but withdraw our memorandum opinion and judgment of May 5, 2022, and we substitute this memorandum opinion and judgment in their stead.

## I. BACKGROUND

### A. Department History

On February 28, 2019, the Department received a report alleging the neglectful supervision of Mother's four children: J.A.L., a six-year-old boy; J.L., a four-year-old-boy; H.P., a two-year-old girl; and A.R., an eight-month-old girl. According to the Department's removal affidavit, Investigator Jasmin Enriquez testified that both J.L. and H.P. alleged that Father assaulted Mother while she was pregnant with O.O. H.P. told Corpus Christi police officers that "she saw [Father] kick mommy in the stomach." Mother was transported to Bay Area Hospital with stomach pains, a swollen black eye, and two

2

scratches on the right side of her face. She also had scratches and bruises on her arms and legs. Father was arrested and jailed. At the hospital, Mother tested positive for marijuana, and admitted to using marijuana that morning. The Department implemented a safety plan where Mother and her children would be supervised by her maternal great-grandparents in Port Lavaca, Texas. The safety plan also recommended that Father have no contact with Mother or the children.[2]

On March 29, 2019 and April 12, 2019, Mother tested positive for cocaine and marijuana. O.O. was born in April 2019. Mother tested positive for marijuana when she gave birth to O.O.

## B.     The Department's Legal Petition

The trial court granted the Department temporary managing conservatorship of the children on April 10, 2019. The same day, it issued a "Kick-Out Order" for Mother against Father, ordering Father out of the children's home. The trial court conducted a status hearing on May 7, 2019. At this hearing, it ordered a service plan for Mother that included: (1) abiding by the Kick-Out Order; (2) submitting to random drug testing; (3) completing an alcohol and drug assessment; (4) attending counseling; (5) undergoing a psychiatric evaluation; (6) maintaining contact with the Department; (7) maintaining appropriate housing; and (8) attending classes regarding domestic violence.

On July 19, 2019, Mother tested positive for methamphetamine. On July 23, 2019, the four older children were removed from Mother's care in a companion Department case, Cause Number 2019-FAM-60396-5, and placed into the care of A.H., the children's

---

[2] Father was not the biological parent of J.A.L., J.L., H.P., or A.R. He was, however, the parent of the child Mother was pregnant with at the time of the assault.

maternal Great-Grandma. The Department left O.O., then only three-months-old, in his Mother's care with severe restrictions. The next day, however, the Department received another report alleging neglectful supervision. Mother attempted to sneak Father into her room at the Salvation Army in violation of the Kick-Out Order on July 24, 2019. She also tested positive again for methamphetamines while nursing O.O. Subsequently, on July 25, 2019, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship with respect to O.O. It also filed an Order for Protection of Child in an Emergency and Notice of Hearing.

Mother was placed into Nueces County Drug Court (Divert Court), a specialty court which gave her access to services to help with her substance abuse issues. Mother and O.O. were placed at Sarah's House Emergency Shelter in Corpus Christi. When Mother became non-compliant with her drug court requirements, she was evicted from Sarah's House. At this time, the Department removed O.O. from Mother's care and placed him at The Ark Assessment Center and Emergency Shelter for Youth on October 15, 2019. On November 8, 2019, O.O. was placed with a foster family in Nueces County, Texas.

The trial court held review hearings on November 14, 2019, December 11, 2019, March 3, 2020, and July 7, 2020. The trial court made a notation in its docket journal on July 7, 2020 which stated, "Order – see 2019-FAM-60396-5." This referred to an order in Mother's companion case with her four older children, which set forth the following:

> [O]rder – Status Quo TMC and placement; [C]ovid extension; No unsupervised visitation or contact with the children[;] visits 3x week for 30 minutes. No DCC for [Mother] but DCC ordered for [Father]. [R]eturn in 60 days; 401 extensions.

4

On September 14, 2020, during the COVID-19 pandemic lockdown, the Department submitted a proposed order documenting the trial court's decisions from the July 7, 2020 review hearing:

> Pursuant to § 263.401(b), Texas Family Code, the Court finds that extraordinary circumstances necessitate the subject child, remaining in the temporary managing conservatorship of the Department and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the subject child, an extension of not more than 180 days should be granted due to extraordinary circumstances, the case should be retained on the Court's docket and a new dismissal date should be scheduled . . . .

The trial court did not formally sign this order. On September 17, 2020, the trial court's jurisdiction was again extended to February 3, 2021, under Texas Family Code § 263.401(b). The trial court held a review hearing on January 19, 2021. On February 9, 2021, the trial court sent e-mail correspondence to all counsel of record indicating that its jurisdiction had been extended to July 14, 2021. On June 28, 2021, the court extended its jurisdiction to December 1, 2021.

## C.    Trial

The bench trial occurred on September 15–16, 2021. O.O.'s older siblings' companion case was closed by this time and had resulted with the trial court appointing Great-Grandma and Mother as joint managing conservators. The two older boys, J.A.L. and J.L., were sent to live with Great-Grandma while the younger two girls, H.P. and A.R., lived with Mother. Mother lived with Father, H.P., A.R., and O.O.'s younger sibling, M.O., an infant son born after O.O. was placed into foster care.[3]

---

[3] Father was the biological parent of M.O.

5

The following witnesses testified.

**1.     Delia Olivo**

Delia Olivo, a Department caseworker, testified about Mother's prior significant history with the Department.[4] In 2016, for example, the Department documented six incidents involving heavy methamphetamine use by Mother and others who lived with her, including her mother Y.H. (Grandma) and former boyfriends. The Department also noted an incident where Mother was arrested for assaulting her then-boyfriend, H.P.'s father.

Regarding drug tests, Olivo testified that Father last submitted a drug test on December 7, 2020, and Mother last submitted a drug test on January 14, 2021. Since those two dates, approximately nine months from the time of trial, neither parent submitted to their monthly drug test.

With respect to visitation, Olivo testified Father regularly saw O.O. when he was first removed from Mother's care. After the COVID-19 pandemic lockdown, the Department required visits from March 2020 to October 2020 to be virtual. After October 2020, the virtual visits continued but the parents were also allowed to see O.O. in person once a month. Even though the Department scheduled three weekly virtual visits between O.O. and his parents, parents missed 127 out of 158 scheduled visits from July of 2020 until the date of trial. Neither parent called O.O. for Christmas of 2020 or for his birthday in April 2021. Olivo indicated that the Department offered to pay for Mother's transportation from her home in Port Lavaca to Corpus Christi to visit O.O. but that the

---

[4] The removal affidavit was admitted into evidence during Olivo's testimony.

bus trip originated in Victoria, Texas, and Mother stated that she had no transportation from Port Lavaca to Victoria. Father, however, had a vehicle.

Olivo testified that, before the second day of trial, Mother posted on Facebook that Father allegedly cheated on her while she was pregnant. Father responded with the following:

> It's obvious you don't [GAF]—I guess care about me and try to flip everything on me, accusing me of cheating, then you say you're going to kill me if I leave, but beat your phone up 24/7, but if it's me, I'm cheating. I don't understand you.

Olivo testified that both parents completed parenting classes required by their respective service plans. Mother also completed a domestic abuse awareness class, an alcohol and drug assessment, one individual counseling session, and a psychological evaluation. Father completed a domestic violence class and an individual counseling session. Olivo informed the trial court that, despite the completion of these service plan requirements, the Department still had concerns returning O.O. to Mother and Father. Olivo testified regarding an incident that occurred on June 13, 2020, between Great-Grandma and Grandma. According to Olivo, Father went to Great-Grandma's home to see his children. Father had allegedly been drinking so Great-Grandma asked him to leave. Grandma, however, thought the children should leave with Father. A physical fight ensued between Great-Grandma and Grandma, with Great-Grandma getting bloody and bruised.

Olivo further testified that the Department received a report that the two girls who lived with Mother and Father were "going to school dirty" and "[un]bathed." Olivo also stated that Mother's relationship with her oldest son J.A.L., who lives with Great-

7

Grandma, is strained. Olivo found texts on J.A.L.'s phone from Mother using foul language, stating that it was "his fault" the family was not together, "that if he wants to act stupid, [to] go ahead," and threatening to take away his phone. She noted that J.A.L. refers to Mother by her first name, and not as "mom."

Olivo testified that both parents have criminal histories. Father had a 2015 assault-family violence misdemeanor conviction, a 2017 bodily injury against a family member conviction which was no-charged, and a 2018 assault-family violence conviction, among others. In addition, she testified that Father is currently on probation and has pending criminal charges for possession of drug paraphernalia and public intoxication.

Olivo stated that the Department was unable to verify any employment for Mother or Father, but that Father claimed to own a tire shop. Father claimed to work long hours and stated that this was why he could not comply with his monthly drug screenings or virtual visits. The Department asked if Father could give them copies of drug tests he took for probation or at his employment but it never received that documentation.

Olivo testified that she has made both announced and unannounced visits at O.O.'s foster home in Corpus Christi. She stated that O.O. is "very happy there" and that he has bonded with the foster family. Olivo testified that O.O. was recently diagnosed with autism. His foster family takes him to his medical appointments as well as regular occupational and speech therapy appointments through Early Childhood Intervention (ECI). Neither Mother nor Father have attended any doctor visits where medical professionals have discussed O.O.'s developmental delays, nor have they inquired about attending. Olivo stated that O.O. is sensitive to loud noises and thrives with stability and

8

routine in his daily activities. She does not believe Mother and Father can provide this stable environment.

Olivo testified that Mother and Father have rented an efficiency apartment for nearly a year. When she visits, there is food and electricity. Olivo stated, though, that the oldest sibling J.A.L. reported that his younger siblings have made outcries to him that Mother abused them. J.A.L. reported seeing "marks, bruises, and injuries" on his younger siblings while they were in the care of Mother. Olivo also stated there was a current investigation by the Department for the three children living with the parents because of an allegation that H.P. and A.R. went to school dirty, but there has been no outcome yet.

### 2. Mother

Mother testified that she lives with Father and three of her children. She stated that she was working at a nursing home two days a week but quit because she wanted to stay home with her infant son M.O. Mother testified that Father works from 8:00 a.m. to 7:00 p.m. at a tire shop and makes $1,500 every month. Previously, he worked at a motel, a plant, and a Mexican restaurant.

Mother testified that she has only ever failed one drug test, when she tested positive for methamphetamines in July 2019. When the trial court admitted into evidence two drug tests from March and April of 2019 where Mother tested positive for both cocaine and marijuana while pregnant with O.O., she claimed these were mistakes. Mother stated that she has refused to drug test since January 2021 because "it's not necessary. Nothing is going to change [the Department's] mind." When asked if she knew why Father did not comply with the drug tests, Mother responded, "[W]hat am I supposed to tell him? Miss

work?"

Mother denied that she or Father ever had any domestic violence in their relationship, including when her children told the Department they saw Father kick her in her stomach while pregnant with O.O. She admitted that she and Father were fighting at that time but claimed that the bruises to her face and bloody lip were from running after him during the argument and accidentally tripping.

Mother stated that she never used the bus passes the Department gave her to visit O.O. because she has other children, and she has to be home when they get out of school. Further, she had no ability to get to Victoria, Texas, where the bus trip originated.

Mother stated that everything in Port Lavaca is in walking distance and that ECI could provide services to O.O. in her home. She knows this because ECI was already providing in-home services for her infant son M.O. Mother admitted that she does not know what kind of foods O.O. disliked, what time he went to bed, or if he slept through the night. She testified that she just found out about her son's autism diagnosis when Olivo testified at trial—previously, she only knew that her son was developmentally delayed. She did, however, admit that she told Olivo once that if any of her children had autism, it would probably be her daughter A.R., because Mother "stayed high all the time [she was] pregnant" with A.R.

Mother says she, Father, and her children want O.O. to come home. She stated that it was difficult to do the virtual visits because it was hard to get O.O.'s attention with disruptions from her other children. She also testified that she missed some of the virtual calls because she had a government-issued phone, and the phone's internet signal was

10

unreliable. She missed other virtual visits because the children that lived with her were often sick.

### 3. Foster Mother

S.P. (Foster Mother) testified that O.O. was placed in her home on November 8, 2019, when O.O. was approximately six months old. Foster Mother is married to R.P. and they have four other children. Foster Mother stated that O.O. has a speech delay and was recently diagnosed with autism. She stated that O.O. has sensory issues, anxiety, sleep issues, and difficulty transitioning into new activities.

Regarding his sensory issues, Foster Mother said O.O. reacts aggressively when he hears loud noises. He enjoys playing alone and has difficulty playing with her other children. When he gets overstimulated, he looks to his Foster Mother for comfort. He currently has weekly occupational therapy, speech therapy, and specialized skills therapy. O.O. is making progress with his communication by speaking a few words and being exposed to sign language.

Foster Mother testified that changing O.O.'s placement would be "extremely upsetting" for him because he has bonded with her family. Because structure is so important to his peace and development, Foster Mother stated that O.O. is on a structured routine for meals, playtime, and naps. She also tries to find a quiet place where he can play alone sometimes. She testified that she and her husband can financially provide for O.O. in the long-term, that she believes it is in O.O.'s best interest to stay with her family, and that she and her husband want to adopt him.

11

### 4. Court–Appointed Special Advocate Kathleen Cooper

Court-appointed special advocate Kathleen Cooper testified that O.O. is a happy child most of the time but that he has meltdowns when he is frustrated. She testified that O.O. has met important milestones with his foster family like "teething, learning to eat real food, crawling, walking" and has bonded with the family. She stated that she tried reading to O.O. in virtual visits but that it was a challenge.

Cooper stated that her initial attempts to meet Mother were unsuccessful, possibly because Mother believed Cooper was affiliated with the Department. Cooper stated that Mother began returning her calls after Cooper clarified that she was impartial and that her only interest was what was best for O.O. Cooper further testified that Mother understood that she had to comply with her service plan for O.O. to return. However, at one point, Mother made a comment to Cooper that "they can't take my child away just because I don't visit him. It doesn't mean I don't love him." Mother also told Cooper that she did not want to do anymore virtual visits because she believed O.O. would be returned to her in May of 2020 regardless. This concerned Cooper because "[i]f you're going to try to bond, you've got to have communication." She noted that Father went to Corpus Christi to purchase a car earlier in the year and he did not use the opportunity to schedule a visit with O.O.

Cooper testified that Mother was skeptical about O.O.'s developmental delays. When Cooper mentioned that she was concerned about O.O. missing growth benchmarks, Mother responded, "there can't be anything wrong with him. There's nothing wrong with me or [Father]." Mother then admitted, "Maybe it has to do with drugs." Cooper

was concerned that parents would not maintain O.O.'s therapy schedule because they could not maintain their own personal appointments with their required drug testing and service plan classes. She testified that the parents "don't seem to recognize that [O.O.] has . . . issues."

Cooper informed the trial court that O.O. "doesn't really know" Mother and Father, and that during one in-person visit, Mother tried to hug O.O. and he pushed her away. She believes there would be danger if O.O. was introduced to a household with a history of domestic violence and drug use. Cooper testified that Mother and Father have "missed every milestone, every birthday, Christmas, every event" and recommended termination of both parents' parental rights.

### 5. Father

Father testified that he understands O.O. has significant needs and that his goal is to do what he can to provide for his son. He stated he would take his son to all doctor appointments and follow recommendations for treatments and therapy. Father stated that he sometimes works over eighty hours a week. He testified that he and Mother have lived in their same efficiency apartment for more than a year and that it has running water and electricity.

Father recognized that he has a "bad record," but he asked the trial court to "have mercy" on him. He stated that he is working, paying the bills, and supporting his family. He could not attend his monthly drug tests or the virtual visits with O.O. because of his work schedule. He stated that he could not be on the phone at his place of employment, and also recalled that it was hard for O.O. to focus on the screen.

Father clarified to the trial court that he has no pending charges or warrants; he stated that although he was on misdemeanor probation for assault family violence, after a motion to revoke was filed, the criminal court disposed of the charge with time served in county jail. Father claimed he completed his service plan requirements and no longer does drugs. He misses O.O. and wants his son home.

Father testified that he has four biological children, including O.O. and M.O. He sends child support to his other two children through the Texas Attorney General's office, as he has a "no contact" order with their mother. He has not visited his two older children in "a couple of years" because of his history of domestic violence with their mother. He claimed, however, that those charges were "bogus" and that he pleaded guilty to them because he was "young" and "stupid."

The trial court terminated both Mother and Father's parental rights as to O.O. Both parents appealed.

## II.    FATHER'S ARGUMENTS

Father raises three issues on appeal: (1) the trial court's judgment is void for lack of subject matter jurisdiction; (2) the evidence is legally and factually insufficient to support the finding that termination of his parental rights is in O.O.'s best interest; and (3) contingent on the best interest finding, the trial court abused its discretion when it appointed the Department as O.O.'s permanent managing conservator. We address each issue in turn.

### A.    The Trial Court's Judgment

Father's first issue raises a threshold concern regarding jurisdiction. Section

14

263.401 of the Texas Family Code encourages prompt resolution of parental termination suits and thus requires courts to commence a trial on the merits "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." TEX. FAM. CODE ANN. § 263.401(a); *see In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021). To extend the automatic dismissal date, the trial court must find that "extraordinary circumstances" require that the child remain in the department's custody and that the appointment is in the best of interest of the child. TEX. FAM. CODE ANN. § 263.401(b).

The Department filed a petition to terminate parental rights on July 25, 2019. The trial court then appointed the Department as temporary managing conservator on July 26, 2019. The first Monday after the first anniversary of July 26, 2019, is July 27, 2020. Father notes that the Department did not formally request an extension until September 14, 2020. Accordingly, Father maintains that the order terminating his parental rights is void because the trial court's jurisdiction automatically terminated on July 27, 2020. *See* TEX. FAM. CODE ANN. § 263.401(a).

The record shows that the trial court held a review hearing on July 7, 2020. In the docket sheet entry for the July 7th hearing, the court entered the following note: "Order – see 2019-FAM-60396-5." The 2019-FAM-60396-5 case refers to the Department's companion case concerning Mother's four older children, which also had a review hearing on July 7, 2020. This annotation sets forth the following information:

CPS – Both [counsel for CPS appeared;]

[Ad Litem] – ad litem for children in both – spoke to placement – 8yr old wants to stay with [Great-Grandma;] does not want to go home to [Mother]

15

or go live with Baby Brother. Placement does not have financial means of caring for another child[;]

[Counsel for Mother] – [Mother] – does not want to have a hearing; more fruitful if ordered to mediation. Status Quo OK;

CASA – Cooper [. . . O.O.] – foster home good; TMC Dept and DCC; [Mother] – older child wants to stay with [Grandma]. Concerned about placeing [sic] children there for PMC because [Grandma] will not be able to care for them[;]

[Counsel for Father] – Dad – status quo ok[;]

[O]rder – Status Quo TMC and placement; [C]ovid extension; No unsupervised visitation or contact with the children[;] visits 3x week for 30 minutes. No DCC for [Mother] but DCC ordered for [Father]. [R]eturn in 60 days; 401 extensions.

On September 14, the Department submitted a proposed order memorializing the extension of time and referencing the hearing held on July 7, 2020. The September 14th order cites § 263.401(b) of the Texas Family Code, finding that "extraordinary circumstances" warranted the continuation of the case and confirmed the trial court's retained jurisdiction of the matter. Father, however, contends that the submission of this order was untimely, and therefore the trial court lost jurisdiction on July 27, 2020.

The Texas Supreme Court dealt with a similar issue in *G.X.H. See* 627 S.W.3d at 288. In *G.X.H.*, both parents challenged the jurisdiction of the trial court to terminate their parental rights when the order of termination was granted over a year after proceedings began. The high court found that the trial court granted the appropriate extensions in docket sheet notes. *See id.* We find the following language instructive:

We note, first, that nothing in the record reflects the parents ever raised this complaint in the trial court. *See* TEX. R. APP. P. 33.1. More importantly, the parents ignore that trial courts are empowered to make the [§] 263.401(a) findings in writing in a separate instrument or orally in the presence of a

16

court reporter. TEX. FAM. CODE [ANN.] § 101.026. Where, as here, the trial court held an oral hearing on the proposed extension and the parties failed to bring forth the record of that hearing on appeal, we will presume the trial court made the necessary findings to support the extension orally on the record at the hearing. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017) (in the absence of a request for written findings following a nonjury trial, all necessary fact findings are implied); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (all facts necessary to support a special appearance ruling are implied if no findings of fact are issued or requested). Trial courts should make the [§] 263.401(b) findings in a written order as a matter of course, but we hold that the failure to do so is not error, provided the findings are made orally on the record or in some other writing. We further hold that, where the trial court granted an extension after conducting an oral hearing and the record of that hearing is not made part of the record on appeal, courts may imply the [§] 263.401(a) findings were made on the record at the oral hearing.

*Id*. at 299.

We note some similarities between *G.X.H.* and the case at bar. First, like in *G.X.H.*, Father did not raise the issue of jurisdiction at the trial court level. *See id.* Here, in fact, the docket notes indicate that Father stipulated that O.O.'s "status quo [was] ok" at the July 7th hearing. *See* TEX. R. APP. P. 33.1.

Second, the trial court in *G.X.H.* made an annotation in its docket notes where it extended its jurisdiction. *See id.* at 297 (providing that the trial court recorded that there was an "agreed continuance – 10/17/18 for trial, extension granted to reach the agreed trial date."). The supreme court noted that "[f]amily code [§] 101.026 expressly provides that a court may pronounce or render an order on its docket sheet." *Id.* at 298 (citing TEX. FAM. CODE ANN. § 101.026). Similarly, in this case, the trial court's docket notes reference the "extraordinary circumstances" of the COVID-19 pandemic and "401 extensions," citing to family code [§] 263.401. *See* TEX. FAM. CODE ANN. § 263.401. Just like in *G.X.H.*, "[w]e conclude the only reasonable interpretation of this docket entry—which was entered on

17

the date of the hearing on the Department's motion for continuance—is that the trial court granted both a continuance of the trial date and an extension of the automatic dismissal date under section 263.401(b)." *Id.*

Third, like *G.X.H.*, we do not have a reporter's record from the July 7, 2020 review hearing. However, like the *G.X.H.* court informs us, we may presume the trial court made the necessary findings to support the extension orally on the record at the hearing. *See id.* at 299; *Bradberry*, 526 S.W.3d at 480; *Marchand*, 83 S.W.3d at 795. The court's notes on the docket sheet confirm these findings. *See* TEX. FAM. CODE ANN. § 101.026. In light of the foregoing, we hold that the trial court maintained continuous jurisdiction over this case and overrule Father's first issue.[5]

## B.   Sufficiency of the Evidence

By his second issue, Father contends the evidence is legally and factually insufficient to support the finding that termination of Father's parental rights is in O.O.'s best interest.

### 1.   Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights

---

[5] We also recognize that this case occurred during the COVID-19 pandemic and note that the Texas Supreme Court authorized several deadline extensions through emergency orders issued during that time. *See* TEX. GOV'T CODE ANN. § 22.0035(b) (providing that "the supreme court may modify or suspend procedures for the conduct of any court proceeding affected by a disaster during the pendency of a disaster declared by the governor."); *see also C.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-21-00587-CV, 2022 WL 1121428, at *4 (Tex. App.—Austin Apr. 15, 2022, no pet. h.) (mem. op.) (noting, in a parental termination case, that "[e]ach time the dismissal date was extended, an emergency order related to COVID-19 permitted the extension, and each extension complied with the Supreme Court order in effect at the time."); *E.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *5 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (providing that "several of the supreme court's emergency orders allowed courts to grant an additional 180-day extension").

and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent committed one of the acts prohibited by § 161.001(b)(1)(A–U) of the Texas Family Code and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b)(1)(A–U), (b)(2); *In re J.L.*, 163 S.W.3d at 84.

The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). It is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). In our legal sufficiency analysis, we must view the evidence in the light most favorable to the finding, and we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *In re J.F.C.*, 96 S.W.3d at 266). However, this does not mean

19

that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id*. If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact[]finder could reasonably form a firm conviction or belief that the parent violated a provision of [§] 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the

> disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, the presumption is not irrebuttable; the Texas Family Code and direction from the Supreme Court of Texas provide additional factors for assessing the best interest of a child. *See* TEX. FAM. CODE ANN. § 263.307; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). *Holley* outlines nonexclusive factors the court should evaluate

20

when considering whether termination in in the child's best interest:

(1) the child's desires;

(2) the child's emotional and physical needs now and in the future;

(3) any emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist the individuals seeking custody to promote the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and

(9) any excuse for the parent's acts or omissions.

544 S.W.2d at 371–72. The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child. *In re C.H.*, 89 S.W.3d at 27; *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

## 2. Analysis

Father claims there is insufficient evidence to show that termination is in O.O.'s best interests. *See In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.) We thus review the *Holley* factors against the facts of this case. *See Holley*, 544 S.W.2d at 372.

Regarding the first factor, because O.O. was only two years old at the time of trial,

we do not know his desired placement. *See id.* Accordingly, this factor is neutral in our best interest analysis. The second factor concerns O.O.'s emotional and physical needs now and in the future. Testimony from Olivo, Cooper, and Foster Mother indicated that O.O. is a toddler diagnosed with autism spectrum disorder. Foster Mother stated that O.O. craves structure and attends regular speech and occupational therapy. Olivo testified that O.O. is "very happy" with his foster family, and that she does not believe Mother and Father can provide this stable environment that O.O. requires to continue to progress and thrive. Olivo also stated that Foster Mother takes O.O. to regularly scheduled medical and therapy appointments through ECI. Father has not attended any doctor visits where medical professionals have discussed O.O.'s developmental delays. Although Father claims he would ensure that O.O. attended every appointment, Father himself did not make his own court-ordered appointments for drug-testing or visitation, stating that his work schedule prohibited him from doing so. Considering the evidence, we conclude this factor supports the termination finding.

Third, we review any emotional and physical danger to the child now and in the future. *See id.* In this regard, we consider the multiple documented instances of domestic violence between Mother and Father. Two of Mother's children told Corpus Christi police officers that they witnessed Father kick Mother in the stomach when she was pregnant with O.O. Mother was transported to the hospital with stomach pains, a swollen black eye, and two scratches on the right side of her face, although later she claimed these injuries were a result of tripping and not through Father's intentional acts. Father also has multiple criminal convictions of assault family violence. Thus, the trial court could have disbelieved

22

Mother's testimony. *In re J.P.B.*, 180 S.W.3d at 573. "The parent's criminal history is also a factor that may be considered when determining if the parent has engaged in an endangering course of conduct." *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.). "Courts may consider a parent's criminal offenses that occurred prior to the birth of the child who is the subject of termination proceedings, and these offenses 'can still be considered as part of a voluntary, deliberate, and conscious course of conduct' that has the effect of endangering the child." *Id.* at 635–36 (quoting *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.)). We conclude that a review of this factor supports the trial court's best interest finding.

Fourth, we consider the parental abilities of the individuals seeking custody. *See Holley*, 544 S.W.2d at 372. We recognize that Father completed his parenting course, a domestic violence class, and one individual counseling session. We also note his work ethic and ability to provide for Mother and the three children currently living with them. However, at the time of trial, there was an open Department investigation for those same children because they were arriving to school "dirty" and "[un]bathed." Further, Father missed 127 out of 158 scheduled visits with O.O. from July of 2020 until the date of trial, and he did not call O.O. for Christmas of 2020 or for O.O.'s birthday in April 2021. When Father traveled to Corpus Christi to purchase a vehicle, he did not attempt to schedule a visit with O.O., although physical visits were an option after October of 2020. Finally, Father also admitted he has two children with another woman that he has not visited "in a couple of years" because of an existing "no contact" domestic violence-related order with their mother. Weighing this evidence, we conclude this factor favors the trial court's

23

best interest finding.

Fifth, we review the programs available to assist the individuals seeking custody to promote the best interest of the child. *See id.* Again, we note that Father completed the parenting course, domestic violence class, and an individual counseling session required by his court-ordered service plan. However, we also point out that Father testified that his work schedule was so taxing that he was unable to attend more classes and/or his drug screenings. We thus conclude that this factor is neutral in our consideration of the best interest finding.

In the sixth and seventh factors, we consider the plans for the child by the individuals or agency seeking custody, and the stability of the home or proposed placement. *Holley*, 544 S.W.2d at 372. We acknowledge that Father has provided stable housing for Mother and three children for nearly a year. Multiple witnesses testified that the home, although small, has consistent food, running water, and electricity. However, Father and Mother have a history of domestic violence and continue to publicize their relationship issues on Facebook—up to and during the trial at issue. There is also an open Department investigation regarding the care of the children currently in Father's home. The proposed foster home placement, on the other hand, is stable. O.O., a child with special needs who has bonded with his placement family, is reportedly happy, has his medical and emotional needs met, and is making progress with his developmental skills. We conclude these factors support the trial court's best interest finding.

For the eighth and ninth factors, we consider the parent's acts or omissions which may indicate that the existing parent-child relationship is improper, and we look for any

24

excuse for the parent's acts or omissions. *Id.* We again note Father's claim that his work schedule prevented him from visiting O.O. or attending his drug screenings. Accordingly, we hold that analysis of these factors favor the trial court's best interest finding.

After a review of the *Holley* factors, we conclude that there were two factors neutral in the termination decision (factors one and five), and seven factors showing clear and convincing evidence that termination of Father's parental rights was in O.O.'s best interests (factors two through four, and six through nine). Accordingly, we hold that there is legally and factually sufficient evidence supporting the trial court's best interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We overrule Father's second issue.[6]

### III. MOTHER'S ARGUMENTS

Mother asserts that there is legally and factually insufficient evidence to support the trial court's decision: (1) to terminate her parental rights under §§ 161.001(b)(1)(B), (D), (E), (N), or (O) of the Texas Family Code; and (2) that it in the best interests of O.O. to terminate her parental rights.

### A. Section 161.001(b)(1)(D)

By her first issue, Mother contends that the evidence was legally and factually insufficient to support termination under the above-listed predicate grounds. We first address Mother's sufficiency challenge to the trial court's (D) and (E) findings. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam).

---

[6] Father's third issue, that the trial court abused its discretion in appointing the Department as O.O.'s permanent managing conservator, was contingent on the resolution of his best interest issue. Because we have concluded that legally and factually sufficient evidence supports that termination of Father's parental rights was in O.O.'s best interest, Father's third issue necessarily fails. *See* TEX. R. APP. P. 47.1.

### 1.    Applicable Law

A parental rights termination decree must be based on at least one predicate ground. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). If multiple predicate grounds are found by the trial court, we affirm based on any one ground because only one is necessary for termination of parental rights. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied). Therefore, to prevail on appeal, a party must challenge the sufficiency of each affirmative finding of a predicate ground for termination or at a minimum challenge the best interest finding. *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.). However, if parental rights are terminated pursuant to § 161.001(b)(1)(D) or (E), we must determine whether the evidence supports that finding even if there are other grounds for termination. *See In re N.G.*, 577 S.W.3d at 235 ("[D]ue process . . . requires a heightened standard of review of a trial court's finding under [§] 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination. . . .").

Section 161.001(b)(1)(D) provides for termination of parental rights if there is clear and convincing evidence supporting a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* Subsection D addresses the child's surroundings and environment. *In re N.R.*, 101 S.W.3d 771, 775–76 (Tex. App.—Texarkana 2003, no pet.). In this context, the child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "A child is endangered when the environment creates a potential for danger that the parent

26

is aware of but disregards." *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

We examine evidence of the parent's conduct and the child's living environment before the time the Department removes the child. *Ybarra v. Tex. Dep't of Hum. Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi–Edinburg 1993, no writ); *see also In re A.G.*, No. 07-17-00440-CV, 2018 WL 1999171, at *5–6 (Tex. App.—Amarillo Apr. 27, 2018, pet. denied) (mem. op.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the child's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). Subsection D permits termination based on only a single act or omission. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

### 2.    Analysis

The evidence shows that Mother endangered O.O. before he was born in April of 2019. The trial court admitted into evidence a drug test that revealed Mother tested positive for both cocaine and marijuana in March and April of 2019. She also tested positive for marijuana the day O.O. was born. On July 24, 2019, Mother tested positive for methamphetamines while living at the Salvation Army and attempting to nurse then three-month-old O.O. Mother has refused to take a drug test since January of 2021 because, according to her, "it's not necessary" and "[n]othing is going to change [the Department's] mind."

Although it appears that Mother can now offer stable housing, water, electricity,

and food to O.O., there is an open Department investigation for her children that currently reside with her because those girls attended school "dirty" and "unbathed." We also note that Mother and Father have a turbulent history together. Indeed, even during trial, Mother posted allegations on Facebook that Father was cheating on her.

We conclude there is clear and convincing evidence that Mother knowingly placed or knowingly allowed O.O. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). We also conclude that, based on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother allowed O.O. to remain in conditions that endangered his physical or emotional well-being. *In re M.C.T.*, 250 S.W.3d at 168. We overrule this issue.

## B.      Section 161.001(b)(1)(E)

By her second issue, Mother contends that the evidence was legally and factually insufficient to support termination under § 161.001(b)(1)(E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). She argues that because she never had custody of O.O., "the record [does not] support the finding that [she] engaged in conduct that endangered or abused her children."

### 1.      Applicable Law

Subsection E permits termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* Under subsection E, endangerment encompasses "more than a threat of metaphysical injury or possible ill effects of a less-

28

than-ideal family environment." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Rather, "endanger" means to expose the child to loss or injury or to jeopardize his emotional or physical well-being. *Id.*

The trial court must determine "whether evidence exists that the endangerment of the child's physical well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied). "It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury"; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards. *Id.* Courts may additionally consider parental conduct that did not occur in the child's presence, including that which occurred before the child's birth or after removal from a parent's care. *In re J.T.G.*, 121 S.W.3d 117, 125–26 (Tex. App.—Fort Worth 2003, no pet.); *see also In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.). Thus, evidence of illegal drug use by a parent and its effect on the parent's life and ability to parent may establish an endangering course of conduct under subsection E. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

2.    **Analysis**

Mother's history of drug use need not be repeated but applies to this analysis as

well. *See id.*; *In re K.-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.) ("A parent's use of drugs may qualify as an endangering course of conduct."). Further, because Mother refuses to drug test in accordance with her service plan, the trial court could not have determined if her substance abuse remains an issue.

We note that when Mother was given opportunities to live at the Salvation Army and Sarah's House when O.O. was a newborn, she chose to jeopardize this housing by sneaking Father into her room against policy and/or by continuing to use drugs. The loss of housing endangered O.O.'s emotional and/or physical well-being, and ultimately resulted in O.O. being placed in foster care. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

In addition, Mother and Father's relationship has been violent at times. Father kicked Mother in the stomach when she was still pregnant with O.O. and has a documented history of assaultive convictions. During trial, Mother posted allegations on Facebook that Father was cheating on her and that she wanted to "kill him." This course of conduct creates a potential for danger which Mother should be aware of but consistently disregards. *See In re M.E.-M.N.*, 342 S.W.3d at 262. Further, although it appears that Mother can now offer stable housing, water, electricity, and food to O.O., there is an open Department investigation for the children that currently reside with her. This conduct did not occur in O.O.'s presence, but we may still consider it in the analysis of this issue. *See In re J.T.G.*, 121 S.W.3d at 125–26.

We conclude there is clear and convincing evidence to support termination under § 161.001(b)(1)(E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). We also conclude that, based on the entire record, a factfinder could reasonably form a firm conviction or belief

30

that Mother engaged in conduct or knowingly placed O.O. with persons who engaged in conduct which endangered his physical or emotional well-being. *In re M.C.T.*, 250 S.W.3d at 168. We overrule this issue.[7]

## C.    Best Interest

Mother's third and final issue asserts that there is legally and factually insufficient evidence to support the finding that termination of her parental rights is in O.O.'s best interest. We again use the *Holley* factors to analyze this issue. *Holley*, 544 S.W.2d at 371–72.

As stated above, because O.O. was only two years old at the time of trial, there was no evidence of his desired placement. *See id.* Accordingly, this factor is neutral to the trial court's best interest finding. The second factor concerns O.O.'s emotional and physical needs now and in the future. *Id.* at 372. Cooper testified that O.O. is "very happy" at his foster home and has met milestones such as "teething, learning to eat real food, crawling, [and] walking[.]" The evidence showed that O.O. has been diagnosed with autism. To help with his developmental delays, Foster Mother takes him to weekly speech, occupational, and special skills therapy appointments. Olivo shared that she does not believe Mother and Father can provide the stable, structured environment O.O. needs to continue to thrive, and also questions their ability to continue his services regularly. Mother refutes this by stating that the services can be done in her home.

---

[7] We have concluded that there exists legally and factually sufficient evidence to terminate Mother's parental rights under both § 161.001(b)(1)(D) and (E). *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) ("[D]ue process . . . requires a heightened standard of review of a trial court's finding under [§] 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination. . . ."). We therefore need not address the remaining grounds as we can affirm termination based on any one ground. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied); *see* TEX. R. APP. P. 47.1.

Mother, however, did not attend, nor ask to attend, any doctor visits where medical professionals discussed O.O.'s developmental delays. We conclude that the evidence of this *Holley* factor supports the trial court's best interest finding.

Third, we review any emotional and physical danger to the child now and in the future. *See id.* Mother and Father's relationship has a history of physical violence. Two of Mother's children told Corpus Christi police officers that they witnessed Father kick their Mother in the stomach when she was pregnant with O.O. Despite her children's eyewitness statements, Mother denies that this occurred. Mother continues to publicize her relationship problems with Father on social media. We conclude that a review of this factor supports the best interest finding.

Fourth, we consider the parental abilities of the individuals seeking custody. *See Holley*, 544 S.W.2d at 372. The record shows that Mother completed parenting classes, a domestic abuse awareness class, an alcohol and drug assessment, one individual counseling session, and had a psychological evaluation. Mother, however, has two of her children living with her Great-Grandma, and a fractured relationship with her oldest son J.A.L. In addition, Mother sent text messages to J.A.L.'s phone using foul language, stating that it was "his fault" the family was not together, "that if he wants to act stupid, [to] go ahead," and threatening to take away his phone. Regarding the children currently in her care, Mother has an open Department investigation due to reports that they attended school unwashed. We also note that Mother missed 127 out of 158 scheduled visits with O.O. from July of 2020 until the date of trial. She did not believe she needed to comply with these visits, as Mother told Cooper: "they can't take my child away just because I

32

don't visit him. It doesn't mean I don't love him." Mother has a significant drug history and has failed to comply with her regularly scheduled drug tests. We conclude this factor favors the trial court's best interest finding.

Fifth, we consider the programs available to assist the individuals seeking custody to promote the best interest of the child. *See id.* We note that Mother attended most of the required classes from her service plan. We also note that Mother said ECI could come to her home to give O.O. his necessary therapies for his autism diagnosis. We conclude that this evidence weighs against the trial court's best interest finding.

In the sixth and seventh factors, we consider the plans for the child by the individuals or agency seeking custody, and the stability of the home or proposed placement. *Holley*, 544 S.W.2d at 372. We acknowledge that Mother's home has food, electricity, and water. However, Mother and Father continue to have an unstable relationship, as evidenced by Facebook postings made by both persons during trial. There is also an open Department investigation regarding the care of the children in Mother's home. The proposed foster home placement, on the other hand, is stable. O.O. is happy and has bonded with his placement family. His physical and emotional needs are being met in his current placement. We conclude these factors support the trial court's best interest finding.

For the eighth and ninth factors, we consider the parent's acts or omissions which may indicate that the existing parent-child relationship is improper, and we look for any excuse for the parent's acts or omissions. *Id.* We recognize that Mother cared for other small children, which could make it difficult to travel on a bus to visit O.O. in person in

Corpus Christi, especially during the COVID-19 pandemic. Similarly, we understand that unreliable access to internet may have made some virtual visits impossible. However, Olivo testified that Mother missed 127 out of 158 scheduled virtual visits. This is an excessive amount of absences that is not fully explained by connectivity problems. Further, Mother's explanation that she stopped submitting to drug testing because she believed it would not "change the [Department's] mind" is similarly unpersuasive. We conclude that these factors favor the trial court's best interest finding.

After a review of the *Holley* factors, we conclude that there was one factor neutral in the termination decision (factor one), one factor against the finding of termination (factor five), and six factors showing clear and convincing evidence that termination of Mother's parental rights was in O.O.'s best interests (factors two through four, and six through nine). We conclude there is clear and convincing evidence to support the trial court's finding that it was in O.O.'s best interest to terminate Mother's parental rights. *See id.*; *see also In re F.L.B.*, No. 13-19-00319-CV, 2019 WL 6606159, at *10–12 (Tex. App.— Corpus Christi–Edinburg Dec. 5, 2019, no pet.) (mem. op.) (concluding it was in the child's best interest to terminate a mother's parental rights to her youngest child with special needs where the mother was unable to attend her child's therapeutic and medical appointments, attended only thirteen visits out of 156 visitation opportunities, exposed the child to domestic violence, and she retained custody of her other minor children). We also conclude that a factfinder could reasonably form the same firm conviction or belief in termination, considering the evidentiary record. *In re M.C.T.*, 250 S.W.3d at 168. We overrule this issue.

34

### IV. Conclusion

We affirm the trial court's order of termination as to both Father and Mother.

LETICIA HINOJOSA
Justice

Delivered and filed on the
17th day of May, 2022.